We will hear argument first this morning in Case 23-852, Garland v. VanDerStok. Gen. Prelogger. Mr. Chief Justice, and may it please the Court, the Gun Control Act imposes straightforward but essential requirements. Firearm sellers and manufacturers must mark their products with serial numbers, maintain sales records, and conduct background checks. The industry has followed those conditions without difficulty for more than half a century, and those basic requirements are crucial to solving gun crimes and keeping guns out of the hands of minors, felons, and domestic abusers. But in recent years, companies like the respondents here have tried to circumvent those requirements. They've begun selling firearms as easy-to-assemble kits, and frames and receivers that require minimal work to be made functional. They've advertised the products, in their words, as ridiculously easy to assemble and dummy-proof, and touted that you can go from opening the mail to have a fully functional gun in as little as 15 minutes, no serial number, background check, or records required. Those untraceable guns are attractive to people who can't lawfully purchase them or who plan to use them in crimes. As a result, our nation has seen an explosion in crimes committed with ghost guns. In the face of that public safety crisis, ATF promulgated this rule to underscore two points about the Gun Control Act's plain text. First, a weapon parts kit that can readily be converted to function as a gun with common tools, often in under an hour, is a covered firearm. Second, a product is a frame or receiver under the Act, even if the buyer must drill a few holes or remove a few superfluous pieces of plastic to make it functional. Both of those points are consistent with how ATF has interpreted and implemented the Act across five decades and 11 different presidential administrations. Respondents now seek a sea change in the Act's scope. They claim that if a firearm isn't 100% functional, if it's missing just one hole that could be drilled in seconds and immediately assembled into a working gun, that product can be sold to anyone online with no background check, no records, and no serial number. That contradicts the Act's plain text, and it also contradicts common sense. This court should make clear that the Act regulates these products as what they are, firearms, and frames and receivers of firearms. I welcome the court's questions. Does this new regulation cover all of Chapter 44? Yes. So I think that the understanding of a firearm reflected in the final rule does reflect the 922A13 definition. Would it also apply under 924? Yes. And so I think that that also incorporates, though, Justice Thomas, the mens rea requirements that are under 924, which I think guards against some of the concerns that respondents have raised in this case that manufacturers could unintentionally be swept up by these restrictions. For example, 924A1D requires a showing of willfulness with respect to selling products without a serial number or without a license. You make a lot of the fact that this has been regulated for half a century, but it wasn't regulated in this way for half a century. What was the original reg, the previous reg? The previous reg defined a frame or receiver with respect to particular components that were housed in that primary structure. But, Justice Thomas, I agree that this rule reflects any fundamental change in approach, because under that prior reg, ATF consistently recognized that even when that frame or receiver, the primary structural component, wasn't yet fully finished or complete, still it would qualify as a firearm looking at the same factors that are listed in the rule. Things like how much time is it going to take to make it functional? Do you need special equipment? Do you need to buy parts and are they readily available? Do you need special skill? So all along from 1968 on, the agency has consistently focused on this same issue of how quickly you can make that frame or receiver operational as part of a working gun. And the only change in the rule, and I want to openly acknowledge this as the rule does, is that ATF is now taking account of jigs or templates, which are a form of tool that quickly speed up the process of making a frame or receiver functional, because they show you exactly where you have to drill in that weapon, so there's no trial and error or guesswork. But as ATF explained in the final rule, that wasn't a change in statutory interpretation. It was just a recognition that jigs serve precisely the same function as something like indexing, stamping the frame or receiver to show you where you have to drill. So it goes directly to the question that the agency has asked all along, namely, how quickly, easily, and efficiently can this process be completed? General, I'm looking at agency letters stretching back as far back as 1978. And each of them basically used the same language that the current regulation is using. The agency letter in 1978 said it evaluated an item on whether it had reached the stage of manufacture such that it might be readily converted to functional condition, correct? That's what you're talking about? Exactly right. And I think that that refutes respondent's suggestion here that ATF had somehow been applying a different standard over the 50-year history of the Gun Control Act. Instead, ATF has always looked at whether the item has reached a critical stage of manufacture by reference to what work remains to be done to make it functional. So it's not like these are entirely separate and distinct contexts. As the 1978 classification letter you referenced makes clear, the only way to measure whether something has reached a critical stage of manufacture is to look at how close it is to the final product and what steps you need to take to turn that into a functional frame or receiver. General, I want to know what our standard of review here is because I can imagine a frame or receiver that is just a block of metal that's not readily convertible. I can also imagine some part kits that require such tremendous amount of work that it doesn't qualify as readily convertible. So if I can point to one item that wouldn't qualify, could be swept up potentially by the new regulation. Is that enough to defeat a facial challenge? Is it enough or is that always an as-applied challenge? That is definitely not enough to defeat a facial challenge. So there is no particular product before the court in this case respondents have chosen to sue in this facial pre-enforcement posture. And what that means is that the only question the court should be asking in this case is whether there is anything on the face of the rule that is contradicted by the statutory text. In other words, whether the standards that ATF set forth in the rule are themselves contradicted by the statute and therefore foreclosed by the statute. And they can't make that showing here. It's certainly true that they try to suggest and your question touches on the idea that there might be particular marginal products out there that could test the bounds of whether something is readily convertible, but the court doesn't need to consider those kinds of products in this case because that can all be adjudicated on an as-applied basis going forward. You use the RINA, you use the, our statement in INS versus NCIR, which basically tracks what you're just saying. But in RINA versus Flores, we use a different standard and said that a respondent to prevail must establish that no set of circumstances exist under which the regulation would be valid. You didn't go that route. That would be an even more stringent standard. I think a burden that respondents can't surmount, but we think even under the INS standard that we cite in our brief, it's very clear that there's nothing on the face of the Gun Control Act that prohibits this approach to regulation. How about the Washington State range standard which says even if there might be some applications that are intermissible, those possible applications cannot render the rule facially invalid so long as the rule has a, quote, plainly legitimate suite. Yes, and I think that that standard is equally satisfied as well here. You pointed to the hypothetical possibility of marginal cases where a product would take a lot of time to put together, but I want to emphasize the core of the conduct that this act regulates, which were the ghost gun kits and partially complete frames or receivers that were flooding the market leading up to promulgation of this rule. Those are issues or products where the readily convertible determination was not hard at all because the products were specifically designed and marketed to individuals who could put them together with no specialized skill and often in under an hour with common hand tools. And so I acknowledge the point that maybe there could be other hypothetical applications of the rule that could test the bounds with respect to certain factors, but I think that under any conceivable standard for adjudicating the spatial challenge, respondents haven't come anywhere close to satisfying their burden to show that the statute squarely forecloses the standards in the rule. What is the meaning of the term weapon in 921A3A? Can you give me a definition? Sure. So that's an undefined term, and we think it therefore carries its plain dictionary definition as an instrument of offensive or defensive combat, but nothing in Congress' use of the term weapon suggests that it has to presently be functional as an instrument of combat in order to qualify. And in fact, I would say the rest of the statutory provision makes clear that the weapon might well have to undergo a conversion in order to operate as a gun. There's an expression. It may have to undergo a conversion, but before it's converted, it must be a weapon. That's right. We certainly don't dispute that it has to be an instrument of combat designed and intended to be used in this way. And Congress made clear in the statutory history that the reason it used that term is because there are objects out there, toys and tools, that have a well-known non-weapon use, but that actually do expel projectiles through the action of an explosive. A cap gun is an example of this. It expels birdshot, and so therefore it would fit within the functional definition, but it's not a weapon because it's not an instrument of combat or intended to be used that way. Is it the case that components that can easily be converted into something constitute that thing before they are converted? As a matter of ordinary usage. I think that as a matter of ordinary usage, we're not suggesting that any statutory reference to one thing includes separate and distinct things that can be readily converted. So shifting to our arguments under frame or receiver, subparagraph E. No, I want to stick with the definition of weapon for just a second. Oh, sure. I'll show you. Here's a blank pad, and here's a pen, all right? Is this a grocery list? I don't think that that's a grocery list, but the reason for that is because there are a lot of things you could use those products for to create something other than a grocery list. And so it's not like they're. If I show you, I put out on a counter some eggs, some chopped up ham, some chopped up pepper, and onions, is that a Western omelet? No, because again, those items have well-known other uses to become something other than an omelet. The key difference here is that these weapon parts kits are designed and intended to be used as instruments of combat, and they have no other conceivable use. And I think the further evidence comes from the fact that respondents themselves agree that a disassembled gun qualifies as a weapon. So this is on page 37 of the handbook. So your definition is a group of components that can readily be converted into something and have no other use. They must have no other use in order to constitute that thing. In that situation, they already constitute that thing. I think that you can recognize that something is a weapon, even if it's nonfunctional, if it is clear from objective evidence of. No, I think that certainly is true from the face of the statute, because it has to be, it's sufficient if it's capable of being converted into something that can expel a projectile. All right, thank you. General Preloger, I just want to follow up on Justice Alito's question about the omelet. Would your answer change if you ordered it from HelloFresh and you got a kit and it was like turkey chili, but all of the ingredients are in the kit? Yes, and I think that that presses on the more apt analogy here, which is that we are not suggesting that scattered components that might have some entirely separate and distinct function could be aggregated and called a weapon in the absence of this kind of evidence that that is their intended purpose and function. But if you bought, you know, from Trader Joe's some omelet making kit that had all of the ingredients to make the omelet and maybe included whatever you would need to start the fire in order to cook the omelet and had all of that objective indication that that's what's being marketed and sold, we would recognize that for what it is. And it doesn't stretch plain English to say I bought omelets at the store if you bought all of the ingredients that were intended and designed to make them, especially under statutory language that refers to something like breakfast foods or things that can be readily converted to make breakfast. Can I ask you about the difference between the destructive device and machine gun definitions that also reference parts in a way that this definition does not? I've just been thinking about in 1968 in the Gun Control Act why Congress might have done that differently and these ghost guns weren't around. These kits are a more recent problem, which doesn't mean that plain language doesn't cover the unintended consequence, but in 1968, and I don't know enough about the gun industry to know if this is right, which is why I want your take on this, wasn't it the case then, I think, that destructive devices like grenades or even machine guns were not things that you tended to buy whole because they were so heavily regulated and even illegal to purchase that way as opposed to firearms. So they were generally purchased as components or things that were, you know, able to be converted or made, like it would make sense to think about it in terms of parts. Am I thinking about that correctly based on the industry at the time? Yes, you're exactly right about that relevant difference in how people were ordinarily constructing things like destructive devices that weren't sold in these types of kits. And I think the important thing to recognize and what this question presses on is that Congress can use a variety of verbal formulations to cover similar types of conduct. Each of these other definitions that respondents have pointed to that refer explicitly to parts were enacted at different times from the relevant definition of a firearm and they address different issues in the way that your question touched on. But what respondents are doing is ignoring the language of the statute that Congress did use in 1968 and it expressly referred to things that can be readily converted to function to expel a projectile through the action of an explosive. It's hard for me to see how a weapon parts kit doesn't fit within that plain language because quite literally the kit is intended and designed to produce that functioning weapon in a very short amount of time by people who don't know anything about guns and can do it with relatively little skill. General, I understand your argument under A with respect to things that could be readily converted but there's also the argument under B, frame or receiver, which doesn't include that kind of language that might bring in artifact nouns more obviously. What's your thought about that? So I do think there's language in B that gets us there and it's the fact that Congress referred to frame or receiver but didn't expressly define that term. It's true that in subparagraph A, Congress used the exact language readily converted but that's because that's Congress' definition of the term and if they had defined it solely in terms of the functionality of a gun, you know, if it had just said something that functions as a gun, that would be limited to operational weapons. So Congress had a really good reason to use the language there. Got you. I follow all of that. So then in moving on to B. So moving on to B, Congress didn't define the term which means it carries its plain and ordinary meaning. And we think that the ordinary meaning of a noun like frame or receiver includes objects that are nearly complete but are missing just a few holes that need to be drilled. Now we can't possibly think that every noun that Congress uses everywhere in the U.S. code is used as an artifact noun that carries with it things like Justice Alito's pen and pencil as a grocery list, right? So there's got to be a line that makes this, on your theory of the case, why we should read that into B here but not everywhere in the U.S. code. What are your thoughts? Right. So I want to be very clear that we think that this is a matter of ordinary meaning that you don't need it to be 100% complete. And that, I think that runs across the board. If I mentioned a bicycle but it was missing pedals, as we explained in our brief, you would still recognize that for what it is as a bicycle. That's the first order question. But then the second question arises that it's touched on. If I'm not inclined to think that every noun is used in that way in the U.S. code, I mean that would be a very dramatic argument, right? Lenity, notice, fair notice to people that every piece of paper and pen is a grocery list, you're on notice of that. But is there something particular to this statute that you think would a more narrow approach? Yes. We think the context and purpose of the statute strongly support understanding the term in this way. And the reason for that is because throughout the federal firearms laws, whenever Congress has itself expressly provided a definition, it has included not only the fully complete and functional item but things that are the item and can readily be made to function that way. So I think that's Congress' own indication in this statute that it's trying to ensure coverage not only of things that have the functionality of a frame or receiver at the moment they're sold, but frames or receivers that can be readily converted to function with minimal. If you have something textual, I'd love for you to point me to that and also address your friends on the other side, I'm sure going to make something of this that as recently as twenty twenty one in a brief filed in the Southern District of New York, the government represented that an unfinished frame or receiver does not meet the statutory definition of firearm. Sure. So let me take those in turn with respect to text. What we have, Justice Gorsuch, is the term frame or receiver. That's not defined. And the court has many times recognized it needs to interpret text and context. I think the anti circumvention principle carries a lot of weight here because the respondents are right. And just one unhealed hole is enough. Then basically that coverage for frame and receiver does it help? Does it help that C and D deal with mufflers, silencers and any other destructive devices that don't have conventional frames and receivers? Does that help you? I think that that just goes to show that Congress was trying to broadly cover the scope of products that can qualify as firearms. And it certainly refused respondents suggestion here that every covered object under the statutory definition needs to have a traditional frame. And so I'm wondering whether we can whether looking at C and D and A, which, as you say, carries some broad language about not just complete items might be a textual way to narrow and focus on B without saying every artifact now in the U.S. code carries this feature. Yes, I think you certainly could adopt that interpretation and that contextual surrounding evidence strongly supports our arguments. In this case, I don't want to lose track of your question about the brief court filing in the Syracuse case. I want to be really clear that I think respondents are fundamentally misreading that brief. They suggest that the brief stood for the principle that ATF was arguing that a frame or receiver has to be fully functional to qualify. But if you actually look at that brief, that's not what it says. It walks through the statutory and regulatory history here and makes clear that repeatedly over five decades, ATF has always looked at whether a partially complete frame or receiver can be brought to functional condition quickly, easily and efficiently. So there is no dramatic break in the way that ATF has regulated throughout the entirety of the statute's history. So I'll look at that again. And then last question for me, and I'm sorry to take up so much time. In the regulation, it indicates that a frame or receiver, and I'm stuck on this B point, which has been cut into pieces is still a firearm. So but but one that's been shredded is not. Now, I'm not sure what the difference between cut into pieces and shredding is, but perhaps you can enlighten me and help me there. So this refers to when you already have a fully complete and functional firearm, what steps you would need to undertake to formally destroy that firearm and exempt it from regulation. Those are no longer readily convertible. Right. So once you actually have already brought something within the regulatory scope of the statute, the statute itself and the agency's regulations require that it be destroyed, which is a specialized term in the firearms industry. I can tell you as a factual matter that the most common way that you destroy a firearm is to torch cut it in with three specified cuts that ATF has provided guidance about. This is this is I'm sorry to interrupt, but this is actually about frames and receivers that I'm talking about. And it's forty eight for seventy eight point one to. C and E. Yes. OK. And it talks about partially complete disassembled or nonfunctional frame or receiver. That's what we're talking about, not the firearm. And again, maybe maybe there is a line that I through line, but I couldn't find one between shredding and cutting into pieces. I would have thought that's pretty much the same thing. So that comes, as you mentioned, from four seventy eight point twelve E, which I should note respondents haven't challenged in this case. It tees up a distinct statutory issue about what it takes to destroy a frame or receiver or a regulated object once you already have a firearm. They aren't challenging that here. And the only thing that is before the court is the definition and be recognizing that you don't have a fully functional firearm in the first place, but it illuminates what is a sufficiently complete frame or receiver if a complete frame or receiver is not a firearm. And the only way I can be sure that I don't have a fully complete or nearly complete or convertibly complete frame or receiver and therefore a firearm is to shred it, but not cut it. Oh, no. Let me let me try to clarify that. That's not accurate at all. As the regulation itself makes clear, you don't even get to the question of asking whether it's regularly, readily converted into functional shape unless you have the clearly identifiable unfinished component part. So you have something that is already well along the way to being a frame or receiver. And that's when you would conduct the readily converted inquiry. And there is nothing in the rule or in the agency's past practice to suggest that anything that isn't shredded or cut up or absolutely destroyed is going to be considered a frame or receiver. That would be entirely inconsistent with how the agency has implemented the statute all along. Thank you. Under the rule, what percentage of the parts of the firearm kit must be included in order for it to be a firearm kit? So these kits always come with a frame or receiver. And I think that that's going to be a necessary part. That's usually the part that needs just a couple of holes drilled or pieces of plastic removed. And then the weapon parts kits generally come with the additional components that will allow you to form a fully functioning gun. If you're asking whether it would still qualify as a regulated weapon that can be readily converted if it were missing other parts, you know, I think that's a matter of degree. And it presses on what it means to readily convert. It might be fact specific. So if the part you're missing is something that is super specialized and would be hard to track down or is going to cost you a million dollars, that might not be readily converted. But if you have something that's missing a single pin that you might even have lying around the house, it probably will be. Again, in the spatial challenge, I don't think it's necessary for the court to consider all of the possible permutations of how this could play out with respect to different types of products. The thing that you need to be asking is, did the agency reasonably define the term readily? And it did because it gave it its ordinary definition of a process that's quick, easy, and efficient. And then did the agency identify relevant factors? And I think it did with respect to things like time, expertise, scope of work, and as your question touched on, what parts you would need to actually make it functional. General, we have a clue from the statute's use of the starter gun as an example of something that's readily convertible. As I understand it, to make a starter gun operable, you either have to replace the bore, so you need a new bore part to do that, or you have to drill out the existing bore on the starter gun and get a pin to make it operable, correct? That's right. So the most commonly publicized example that I think was top of mind for Congress, and it's one that's cited in the statutory history here, was the example of a gang member who bought the starter guns in bulk, and then you're exactly right, had to drill out the plugged barrel, or else cut it off and rethread it and put in a new barrel. And often you also have to enlarge the barrel so that it can chamber conventional ammunition if it isn't already able to accept bullets. So we know that some incomplete items qualify under the statute's definition. Yes, and I think that also shows, as the statutory text makes clear, that things that aren't presently functioning as guns but can be readily converted to function are covered under subparagraph A. That was exactly what Congress was trying to accomplish, to ensure that these things that are going to be used as instruments of combat and that can be completed to functional condition with minimal work would come within the scope of the federal firearms law. Thank you, Counsel. Justice Thomas, and Justice Alito. Were weapons parts kits common in 1968? So there have only been a couple of examples over the years that I'm aware of reflected in the case law. We cite the Stewart case and the Witt case. One of those was kind of an Uzi-making kit. Another one involved someone who was making it possible through kit form to construct a machine gun. It wasn't particularly common then, and I can tell you the reason why. The big development and the technological development that led to the explosion of those guns was using polymer in the form of plastic to make this. Are there gun kits available now that do not consist of polymer parts but instead consist of parts taken from disassembled firearms that have been altered in a way to make them nonfunctional without some modification? I'm not aware of any commercial product right now that fits that description. On what it means to be readily convertible, I don't know whether it's possible to do something, that's the statutory term. I don't know whether it's possible to do something more precise than what ATF has done, but it would be interesting, it would be helpful if you could perhaps explain a little bit more what that means, so what level of expertise is taken into account? What collection of tools is taken into account? Can you provide any sort of a time limit? How long must it take? Some of us who are not, don't have a lot of mechanical ability have spent hours and hours and hours trying to assemble things that we've purchased. And with you on that one, Justice Alito, as someone who struggles with IKEA furniture, let me do my best to try to be responsive to that question. And I think the thing to point to is the case law on this point because ATF wasn't just coming up with these factors out of nowhere. Instead, because this is the term that Congress used in the statute, we have 50 years of judicial precedent further fleshing out the contours of when something can be readily converted. So as a general matter, what the courts and therefore what the agency has said is that it is readily converted if someone, if a novice in a fairly quick amount of time can easily and efficiently convert their product into function. You asked about outside bounds like time limits. I can tell you that in the case law, the longest period of time that was ever deemed still readily convertible was eight hours. And the agency has not considered any product greater than eight hours to be readily convertible. So if that issue were squarely presented, a court might hold that something like a day's work or eight hours sets an outer bound. With respect to things like skill or parts availability, obviously that's going to be fact and context specific. And I think the important thing to recognize is that these are principles that were themselves drawn from case law. And the agency, I think, can't be expected to do better than courts themselves have done in trying to flesh out the qualitative standard that Congress chose to use here. Thank you. Justice Sotomayor. Justice Kagan. On parts kits first, in addition to the parts kit that's analogous to an IKEA table kit, Judge O'Connor below was concerned that that language would include sort of any aggregation of gun parts. So let's say, you know, a gunsmith just wanted to replenish inventory and got a big box of gun parts generally from a gun manufacturer. Would that count under the ATF regulation? No. The lower court fundamentally misunderstood how this final rule operates. In the first place, it doesn't regulate something like a gunsmith at home who's buying individual parts and seeking to aggregate them. This is a regulation that only governs commercial manufacturers and sellers of firearms who are themselves constructing the weapons and the kits and putting them on the market. So these are just conditions on commercial sale. And then with respect to what the rule would cover, it's clear from the readily convertible analysis that you need to have a process that's fairly quick, easy, and efficient. And so it wouldn't sweep in things that have a lot of other uses and that would require a lot of skill and expertise or time to track down the missing parts to put together. And I want to emphasize again, it's not like ATF was coming up with this rule without real world experience about the kinds of market, the kinds of products that these fringe manufacturers were putting on the market. These were kits that you could put together in under an hour. They had all of the relevant components. You would just need to do a little bit of finishing work. They actually had the experience of putting one of these kits together and it's just like what the record shows. There are usually only a couple of steps. The first thing that most of the kits require is drilling the holes. Usually it's six holes and you do it with the jig. So you have the product there in the tool and it removes all of the trial and error or guesswork, you know exactly where to drill in seconds. The second step is to remove the extra plastic blocking tabs. That again doesn't require much work at all because you clip them off with a pair of pliers or a box cutter. You can file it down with a jig as a template using a metal nail file or using a Dremel rotary tool that a lot of people, especially dog owners own because it's helpful for trimming your dog's nails. At that point, you have a fully functional frame or receiver and you can quickly assemble it into a gun in no time at all. That's how the products were marketed. That's how they were sold. And turning to the frames or receivers, you made a point of saying that this follows in a long line of regulation, but there were changes, right, that the new regulation is intended to capture items sold with jigs and templates. Is there anything else that the new regulation was intended to capture that was not captured under the old and why did ATF make that change? No, that is the only change. ATF made that change and openly acknowledged and justified its decision because it recognized that when you have a jig, which is this tool, as I mentioned, that removes all of the trial and error and really does make it dummy proof as the manufacturers have claimed, it goes directly to the question the agency has asked all along, which is how quickly, easily, and efficiently can this thing be made to function? So it's no different in kind from indexing on the frame or receiver. Indexing is something that ATF has looked at from 1968 on. It's always recognized that if you actually put a dimple in the frame or the body of the structural component, that's going to speed up the process and jigs work exactly the same way. And let me ask you a broader question if we step back a little bit. Sometimes this court looks at regulations and it says, you know, there's an old statute and the old statute doesn't contemplate a new problem. A new problem comes up and Congress can't get its act together and deal with the old problem and so the agency takes old statutory language that doesn't really fit the problem but, you know, is vague enough or general enough or broad enough, you know, so that it can be kind of made to deal with the new problem and this court has sometimes said, well, that's not right. The new statute had nothing to do with, the old statute had nothing to do with this new problem and this is kind of, you know, the agency just taking over what is really Congress's business. Is that a storyline that the respondents here can tell about this regulation? No, I don't think there is any tenable way to characterize this regulation as an attempt to change the meaning of the statute to confront a new problem. First of all, this is an age-old problem. Congress, I think, rightly recognized that manufacturers might seek to evade these central requirements. That's why any time it's expressly defined a term, like in subparagraph A, it's included concepts of whether an item can be readily made to function. We think the weapon parts kits are precisely described by that subparagraph A description. I acknowledge in subparagraph B, it's not a defined term, frame or receiver, but there again, we think that Congress was simply tracking ordinary meaning which recognizes that if you have that principal structural component of a handgun, that can be recognized as a frame or receiver even if it's missing the single final hole that you need to drill in that. So I think it would be wrong to suggest that the statutory language just on its own terms doesn't cover this situation. And then on top of that, we have context and purpose here. On respondents' theory of this statute, it would be incredibly easy for any gun manufacturer to avoid the regulation and the essential requirements of serializing, background checks, and record keeping just by leaving one little part of the weapon or the frame or receiver unfinished. Plainly, that's not what Congress was intending. And I think it brings this case rarely within cases like Abramski where, as you know, Justice Kagan, the court recognized that if you have an interpretation of the Gun Control Act that is going to allow that entire circumvention and essentially nullify the act's requirements, the statute shouldn't properly be interpreted that way. That was a close case. You maybe want this to be a stronger case than Abramski. It is a stronger case. And the circumvention here is even more profound because it wouldn't just be in the sales transactions with the straw purchaser. It would effectively be all weapons going forward would not need to be serialized or sold with background checks and record keeping. Thank you. Justice Gorsuch? Justice Kavanaugh? Your statutory interpretation has force, but I had some concern at the stay stage and I have some concern now about mens rea. And this is an agency regulation that broadens a criminal statute beyond what it had been before. So what about the seller, for example, who is truly not aware, truly not aware that they are violating the law and gets criminally charged? What assurances can you give about mens rea, about instructions to the jury that the government would seek and the like? So let me begin with the statutory mens rea standard that I think fully addresses this concern. This is in 18 U.S.C. 924 A1D and it requires willfulness. So that means that if a manufacturer isn't putting a serial number on it because the manufacturer believes in good faith that this isn't a regulated product and the manufacturer doesn't know that it's violating the law, it will not be criminally chargeable because the government won't be able to prove that mens rea of willfulness. So I think that's an important check against criminal prosecutions that might be unwarranted. The second thing I would point to is... Does willfully apply to all potential prosecutions that we're talking about in this case? It applies if there's no serial number on the weapon and it applies if the weapon is being sold without a license. I believe that with respect to not conducting a background check, that's under a different provision that requires knowledge. But, of course, the kind of entry point for the weapon is whether or not it has a serial number and that happens at the point of manufacture. I also want to emphasize that to the extent that there is really... So how would that work on a background check? I just want to make sure I'm not missing something there. Yeah, so I think on the background check, if you have a seller out there who wants guidance about whether with respect to a particular type of product it's necessary to do that background check, the person can seek a classification from ATF. The manufacturers would be the ones to do this and this is a way to get a pre-enforcement dispositive ruling from ATF as to whether that's deemed a regulated firearm. And in that circumstance, if you don't like the answer that ATF gives, you have a right to judicial review that will be conducted under a de novo standard about whether this is a covered product. But if you haven't done that, let's say you haven't done that and you truly, take the hypothetical, you truly believe you're not violating the law, could you be charged under that provision? As a theoretical possibility, I think only with respect to background checks, it's possible you could. I'm not aware of any prosecutions that look like this. Is that something the government would do? I don't think that the government would be likely to charge someone in that kind of situation. And it doesn't look anything like what was happening where the manufacturers were themselves the sellers putting these products on the market with explicit knowledge that it was being put into the hands of teenagers, felons, and so forth. That's helpful. Anything else you wanted to finish up with on that? So I guess the only other thing I would say is that we think that there is a lot of protection for manufacturers who are seeking to comply with the law in good faith. ATF is not trying to hide the ball here. The point of the agency is not a game of gotcha to try to criminally prosecute people. There was a very serious public safety threat posed by the explosion and the use of these ghost guns in crimes. And so the whole point of this regulation is simply to put the regulated industry on notice of how the statute applies in that discrete context and how it's always applied since the statute was enacted. And on that point, because you had a lot of classification letters that were out there, this was to collect everything and put everyone, as you say, on notice, adding a couple things, as you pointed out earlier, correct? Right. And so I don't think that this is any vast expansion of the statute. We just think this is ATF's longstanding interpretation. Some expansion. Only with the addition of looking at jigs. But to be clear, that doesn't change the meaning of the statute. It just changes the factors that are relevant under the statute when you're conducting a readily analysis. Okay, that's helpful. Thank you. Justice Barrett? A question about AR-15s. So Judge Oldham expressed concern that because AR-15 receivers can be readily converted into machine gun receivers that this regulation on its face turns everyone who lawfully owns an AR-15 into a criminal. That is wrong. So I want to be really clear about our interpretation of the statute. We are not suggesting that a statutory reference to one thing includes all other separate and distinct things that might be readily converted into the thing that's listed in the statute itself. So the example we give in our reply brief is that a pair of pants is not regulated as a pair of shorts if you have a statute referring to shorts, even though the pants could be readily converted into shorts. That's because pants are a distinct object in their own right and they have a separate identity. And the rule itself incorporates this principle by requiring that the regulated object, before you even get to a readily analysis, has to be clearly identifiable as the unfinished component part of the regulated weapon. So what that means is you would have to say this thing is a clearly unfinished component part of a machine gun, a weapon that's designed to fire automatically more than one shot with a single function of the trigger. But you couldn't say that about an AR-15. That is obviously something that's designed and intended to be used for semi-automatic fire, and the fact that you might be able to undertake certain drilling and machining operations to convert it into a machine gun doesn't mean that while it has this separate identity and is standing alone, it would be regulated as a machine gun. The agency has never held otherwise. This, again, is the same interpretation that the agency has had all along, and it has never suggested that AR-15s standing alone are regulated machine guns. Justice Jackson? So Justice Kagan talked about the problem of the agency potentially taking over what is Congress's business, and I guess I'm worried about the different concern, which is about the court taking over what Congress may have intended for the agency to do in this situation. And so all of my questions, the reason why I didn't really engage in the other part of this is because all of my questions really, for you, stem from that concern. You've phrased the question presented in this case as whether certain items, weapons, parts, and kits, or partially complete and disassembled frames or receivers qualify as firearms within the meaning of the statute. And I guess I'm concerned about this framing because it doesn't seem to account, in my view, for the actual claim that the challengers have made here, which is that the agency has exceeded its statutory authority. And so I'm trying to figure out how we're supposed to address what I think is a distinct question about the scope of the agency's authority vis-a-vis the court to fill out the category of what is a firearm. I mean, are we to conclude that an agency exceeds its statutory authority whenever it fails to choose what we think is the best meaning of a statutory term? Is that how the scope of the agency's authority to promulgate a rule is supposed to be determined? We just compare what the agency believes qualifies as a firearm with what we think qualifies as a firearm, and if the agency has something in its definition that we wouldn't have put there, we say the agency has exceeded its authority? I think those seem not right to me as a way of figuring out the question of exceeding the authority. And I think it can't be assumed that the agency exceeds its authority whenever it interprets a statutory term differently than we would, such that all we have to do as a part of this claim here today is just decide what we think a firearm is. Can you react to that? Sure. So I think as in any statutory interpretation case, the task of this court is to determine what Congress intended and what it meant. And we think that we have clearly the best interpretation of the language that Congress used, but the court has said time and again that you don't just look at text, you interpret that text in context. Right, but can I take you on a little bit of a... Let me just drill down a little bit, right? The term we are interpreting, I thought, was a category. Congress has said firearms, right, and frames and receivers, which it defines, the firearms part of it, have to be treated in a certain way. And I think in order to implement this statute, the agency has to look at real-world circumstances and determine what particular items fit into that category. I understood the delegation of this entire thing to an agency to be that task. That's what the agency is supposed to be doing. We look at firearm, we look at the definition of the firearm, says the agency, and we look at things in the world and we say X, Y, Z, those are in that category. My question is, when the challenge is X shouldn't have been in that category, does it exceed the agency's authority if the court thinks, yeah, X shouldn't have been in that category? Just, you know, I mean, the agency still has the authority, I think. And in LOPR, LOPR seemed to recognize that Congress may have given the agency the authority to make certain calls, right? So I think in responding to this question, it's really helpful to distinguish between the facial challenge here and some of these as-applied applications of the agency's determination of what fits within the definition. I do think that if the court concluded that Congress, in drafting this statute, had, for example, categorically precluded looking at time in deciding whether something's readily convertible, then the agency would be exceeding its authority because, of course, if Congress has said in the statute, you can't think about time, then the agency can't choose to do so. We are miles away from that kind of situation here because all of the factors the agency listed on their face are consistent with the plain meaning of what it is to readily convert. So what you have us do is not come up with our list of what items we think should be in the firearm category. Like, we have to think about exactly each thing. In this facial challenge, I think you're saying we need to do something more like, did the agency take into account the relevant factors for making the determination of what goes in this category? That's right, because you don't have any particular products in front of you to examine in light of whether they would fit the definition or not. The only relevant question in this case is the facial question of, does this regulation conflict with anything in the Gun Control Act? And our answer is no. We think that this follows from the plain text of the Gun Control Act and is consistent with judicial precedent interpreting that plain text. With respect to any follow-on questions about particular products, that could all be assessed as applied in light of their specific facts to make a determination about how the factors might cash out in an individual case. But for the front-line question of the agency's authority here, we think everything in the final rule is consistent with the statute Congress wrote. Thank you. Thank you, Counsel. Mr. Patterson? Mr. Chief Justice, and may it please the Court, this case turns on decisions made by Congress in the Gun Control Act of 1968. First, Congress altered the common understanding of firearm to include other weapons that may readily be converted to firearms. Second, in a departure from prior federal law, Congress decided to regulate only a single part of a firearm, the frame or receiver, and Congress did not alter the common understanding of a frame or receiver. ATF has now exceeded its authority by operating outside of the bounds set by Congress. One, ATF has expanded the definition of frame or receiver to include items that may readily be converted to a frame or receiver. And two, ATF has expanded the definition of firearm to include collections of parts that are not weapons and that do not include a frame or receiver. Some concern has been raised about circumvention. But, of course, complying with the statute is not circumventing it. And as this Court said in Abramski, which has already been referenced, Congress in the Gun Control Act did not seek to pursue its purposes of controlling access to firearms to the nth degree. And notably, Congress did not regulate the secondary market for firearms. And that secondary market is a much bigger source of firearms for criminals than privately made firearms. There also have been questions raised about the agency's prior practice. There definitely has been a sea change by the agency here. The agency projected that its rule would put 42 out of 43 unlicensed manufacturers out of business. And what the agency said in the Syracuse litigation was they said an unfinished frame or receiver does not meet the statutory definition of firearm simply because it can be designed to or can readily be converted into a frame or receiver. That's the exact standard they've now adopted. Instead, what they looked at was whether critical machining operations had taken place. And to be clear, we have no quarrel with that prior practice. We have raised as alternatives, one, something has to be completely machined, or two, the critical machining operation test. And the latter, we submit, is more consistent with the statutory language and solves the machine gun problem. Because if you say, in the machine gun provision, a frame or receiver is also regulated. And if one hole is all that separates a semi-automatic receiver from a machine gun receiver, it's hard to see how the readily standard would not also be applied there. I welcome the Court's questions. Judge Oldham makes much of the 80% rule that is the stage of manufacture versus what a receiver or an item is capable or can readily become. And we've had much discussion here about readily this morning. Is that analysis or that approach, does it make a difference as to your argument, whether it is the 80% rule or the current readily become rule? Yes, I think it does for at least three reasons. One, we submit it can't be readily because when Congress wanted it to be readily, it put it in the statute in multiple circumstances. Two, it has a different practical impact, for example, in the machine gun frame example. So if the standard is readily and the government gives us kind of the paradigmatic example of readily drilling one hole, well, if all you have to do is drill one hole into a receiver to make it a machine gun receiver, it's hard to see how that is not a machine gun receiver. And three, Congress said the frame or receiver, what Congress did not include in this statute was parts that may be used to convert an item. I think I'm a bit more interested in how the 80% rule operated. We've heard much about the readily this morning and whether or not that change actually took place and whether it really matters. Yes, it does really matter, and just the 80% rule is kind of a colloquialism used in the industry. What the governing standard was was called the critical machining operations test. And what the agency would do, based on what the definition of a frame or receiver is, the part that holds the essential firing and sealing components of a firearm, would say we're going to look at that part of the firearm and see if critical machining operations have taken place. And then as a cross-check, there sometime would be temporal considerations. This is what the agency said in the Syracuse litigation. Temporal considerations were tied to the degree of machining. It was kind of like a lodestar cross-check in a fees case. So they would look at those temporal considerations. But where the difference would be made, and we can see this very clearly in the regulation of AR-15 lowers, and that is the same piece of metal can be considered a frame or receiver depending on what is sold with it. Under the old standard, you would look at the item itself, and that's what Congress did in the Act. They said look at the item itself. It did not say look at other things that may be used to convert that item into a frame or receiver. And that's what the agency is now doing, for example, with looking at the jigs. Because really what is being done is that jig is being regulated. Because the same piece of metal can either be a frame or receiver depending on... But I thought readily convertible was in the statute. Readily convertible is in the statute under Part A. Okay. It is not in the statute under Part B. So then you cannot... It would be very odd to say that, well, we're going to say readily convertible is an implicit... For a frame or receiver, but does the 80% rule apply then to Part A? I'm just trying to understand your answer to Justice Thomas with respect to the 80% rule. Yes, and again, understanding that we're using 80% rule as a stand-in for critical machining operations. No, that applies to Part B. That is what the agency would look at to determine whether something had become a frame or receiver. And if you're... Counsel, doesn't that give your game away? Once you admit that you need to figure out when something has become a finished product, you have to have a standard to decide that. And you're saying the standard has to be something along that goes to manufacturing. The SG is saying, yes, that's just a silent way of saying has the manufacturing gone far enough to make this essentially a frame or receiver? Can it be converted to be fully functional? That's what they're saying, that the two are doing exactly the same thing. You prefer one because you want to sell frames without a serial number or sell frames that you have to drill a hole in and say that's not regulated. They're saying a hole is really not a critical component of the frame. Everything else is. So I'm having difficulty understanding, once you admit that some sort of test is necessary, why this particular test exceeds their statutory authority. Yes, and so... Since it's only a different way of getting to the same thing. Understood. Do I have enough of a frame or receiver to call it a frame and receiver? Understood. To be clear, we've provided the court two alternatives. One is that all of the machining operations have taken place. So if you were to say this was a sculptor, all the chiseling has been done, everything's been done, that this can now function as a frame or receiver. Or alternative... You don't disagree that taking a tab off a frame, is that a completed frame? I don't think taking a tab off, if you could do it with your finger, that's not like actually removing material. So if you have to drill a hole to attach it to something, that's not a completed frame? Well, this is where the difference between the two alternatives that we have given the court comes in. Under the first alternative, drilling a single hole would be what would make it cross the line. And the government admits that sometimes drilling a single hole can be the difference between a semi-automatic receiver and a machine gun receiver. And a machine gun receiver is much more heavily regulated than a semi-automatic receiver. So the notion that just one hole separating something from another item is somehow absurd is clearly not the case. But the alternative we've given you is the critical machining operations test, and that is different from the government's new test because, A, it's not conflicting with the statute by taking language from another part of the statute that's not there and putting it there, and where the government represented in this Syracuse litigation in 2021. We can't do that. Let me come out of the on-site sheet, please. What is the purpose of selling a receiver without the holes drilled in it? Well, some individuals, just like some individuals enjoy, like, working on their car every weekend, some individuals want to construct their own firearms. So the purpose of selling it is to allow... I'm sorry, go ahead. ...is to assist and provide individuals with material with which they can do that. Well, I mean, drilling a hole or two, I would think, doesn't give the same sort of reward that you get from working on your car on the weekends. Well, I would encourage the court to read the Vasquez brief. This is not an easy thing necessarily to do, and particularly the Press Democrat article cited there where the reporter engaged to show how easy this was and, in fact, showed that he couldn't actually do it. He had to engage friends to help him complete this that were experts in the firearms. And even once you have a complete frame, it's not a trivial matter to put that together. There are small parts that have to be put in precise locations, and that reporter, he couldn't put it together from the completed frame. So it's not clear that it is a trivial... It is clearly not a trivial proposition for someone to do this. Well, I don't know the skills of the particular reporter, but my understanding is that it's not terribly difficult for someone to do this, and it's certainly not terribly difficult to take the plastic piece out. Is that part of the gunsmithing? Well, the plastic, the parts that are blocking the rails in the product that's been highlighted, that has to be taken out. It's recommended that you put it on a drill press vise and use a drill press with a specialized bit to take that away. And Polymer Aid explicitly recommends against using a Dremel. They say that could damage the product. And I know we don't have any particular product at issue here, but the point is that what Congress said is that we want to regulate the frame or receiver itself, and there's got to be some point. There's going to be a line. I'm suggesting that if someone who goes through the process of drilling the one or two holes and taking the plastic out, he really wouldn't think that he has built that gun, would he? You know, I don't know what that person would think, but I think he would. It's not a simple proposition. Even the individuals that the government cited that took 21 minutes to put something together, it wasn't counting the time for the person to acquire the tools, learn how to use the tools. This person was a mechanic, so they knew how to do these things. Or the time to learn how to machine the object. That person spent two hours watching instructional materials before starting to put that item together. And even after that 21 minutes, the person had done it incorrectly, and it needed to be repaired. I'd like to circle back to Justice Sotomayor's question on B. I take that one position might be it has to be a complete frame or receiver because there's no indication of readily converted the way there is in A. Right. I got that argument. But I think you've suggested that, no, we accept that there are incomplete frames or receivers that count. This is indeed an artifact now. And if that's true, well, first of all, is that true? Well, our primary argument is no. It's got to be complete, but we've given an alternative argument that, okay, it could be an artifact now, but if it is, the test should be critical machining and not readily converted. Let me press on the first argument. Why wouldn't this be an artifact now in this statute, given A, which does suggest incomplete things can count, C, you know, mufflers and silencers, Ds, other destructive devices, which don't have a traditional receiver? I think the examples we've been given are umbrella guns and pen guns and things like that. Why wouldn't that be an indication that here, if not throughout the U.S. Code, Congress was using an artifact now? I would think the inference would be precisely the opposite because Congress put that language specifically into those neighboring statutes, words like converted or words like collections of parts, so it would be odd to say that in this particular place where Congress has taken a special care to use that sort of language when Congress wanted that language to be applied to say, well, we're just going to infer that it also applies here where Congress did not put that language. And I think it could, again, as I've said, it could wreak havoc with the firearm laws because there are a lot of things that can be readily converted. A traditional rifle can be converted to a short-barreled rifle in minutes with a hacksaw or by swapping in a shorter barrel. So if this concept, readily converted, Congress only put it into specific places. And we can see in the machine gun provision, Congress said readily restored instead of readily converted. So we need to be very precise here. And in terms of why we would pick critical machining operations instead of readily converted, if we're looking for evidence of meaning, if we're not going to say it has to be completed, well, one evidence of meaning was what did ATF and the industry working together over a period of years arrive at? And what they arrived at was this critical machining test because it does not pose these same problems as readily converted would, potentially with other provisions of the code, and it also is more consistent with the statute by not importing readily into a place where Congress chose not to put it. Thank you. It doesn't appear in the statute. It seems a little made up, right, the critical machining test? I mean, your other test, I think, has the problem of pulling a tab off the front and saying, okay, now it's a frame of receiver, but it wasn't before you pulled the tape. But the critical machining doesn't really come from the statute. It's just sort of a way of allowing for de minimis exception, right? Well, I wouldn't say that, Your Honor. And first, even under our primary test, I think if it's machined, so if you think of a sculptor, when everything's been sculpted, if something is put on to protect it or something and it has to be pulled off, I wouldn't call that machining. So I think it's once all the holes have been drilled, all the material has been removed that requires tools to be removed. That would be our primary test. But then under the secondary test, so it would come from the language of frame or receiver. And I think you would say, okay, this is an artifact now, but then what does that artifact now mean? We have to still determine at what point something is a frame or receiver. And we think the evidence of meaning of the agency and the others in the industry who are very keenly interested in this question, working it out over a period of years and saying, okay, here is this test that we've come up with, this critical machining test. It's much better attested than readily. So would you say that it's like the ordinary usage, now everybody just understands based on longstanding practice that this critical machining test is the point at which frame or receiver... Correct. And it's not that we're deferring to that, but that's the best evidence we have of what this means. In ordinary usage, an object that is created to perform a function may still be called by the name that's attached to that object, even if it is not completely functional. Isn't that what this gets at? I don't believe that this is what it gets at. And there are two provisions here. Well, before you walk away from that, let me give you an example. Suppose I see that my neighbor is restoring a classic car, but he's taken out some critical parts. And then someone says, well, what is that? And I might well say, well, that's a 1957 Thunderbird, even though you couldn't drive it and it would take some work to make it do the thing that it was originally created to do. So isn't that the essence of your backup argument? The thing must still be such that one would call it a frame or receiver, even if it is not fully ready to be functional as a frame or receiver at this time. Yes, yes. So our primary argument is it would have to be, and so I think you could think of the situation with a car and you ask your neighbor, can I borrow your car? And you give him the car with the engine taken out. Probably say that's not a car, but also the backup, yes, is that at some point something is a car, even if it can't currently perform that function. So what exactly does the critical manufacturing, a critical machining test involve? What does that mean? Explain it to somebody, to a layperson. Yes, so a frame or receiver is basically the part of a firearm that holds the components that allow a firearm to function. So the firing mechanism, the trigger and such, and the sealing component that makes sure that the barrel is sealed off so that the round goes out of the barrel and the energy from the explosion doesn't go elsewhere. So what the critical machining operations test was, okay, we're gonna focus on the parts of the frame or receiver that either have the holes drilled or material removed that are going to hold those parts, and we're gonna see, have those operations been performed or been performed to some degree? And if they have, we're going to say that's a frame or receiver, and what's important is that this solves the one hole in the AR-15 lower problem because the critical machining operation for that machine gun receiver would be drilling that final hole. So until that final hole is drilled, or at least indexed, as the government has indicated, that critical machining operation has not taken place. But if the question is readily, then it would be hard to see, well, how it could be readily in this context and not readily in the machine gun context. So you've presented the court with the critical machining alternative, and you say you have these two alternatives. The agency has presented yet another way of going about this. Do you concede that under a facial challenge like the one that you've brought, your task is actually to demonstrate that your alternatives are the only permissible ones under the statute? Well, I think it's under a rule of party presentation. We presented the court with the alternatives that have occurred to anyone, so I think these are the best alternatives that have occurred. So you see the question as, what is the best alternative? And the court is just supposed to say, we have three options here. Which one do we think the best? The agency didn't pick the best. It's rule-stricken. Well, I think we actually don't have that. I think our burden is to show that the agency is wrong. Maybe we don't have the right interpretation. But if their interpretation is incorrect, then they're asking the wrong question. But by incorrect, you mean that they don't have the authority under the statute to reach that. It's inconsistent with the statute?  If frame or receiver does not include items that may readily be converted to frames or receivers, then this rule is beyond their authority, regardless of what frame or receiver does mean. So they've gone beyond their authority. And so we presented the courts with two alternatives that we think are better interpretations. But the key point here is that the agency's interpretation is incorrect. Do you believe that a weapon that has been disassembled, a firearm, a gun that was once fully operational, everyone would agree was a firearm, it's disassembled, as sometimes happens, maybe even after a crime, is that still a firearm or no, under your view? Yes, and for two reasons, if I could get it. So the first reason is that we'll have a frame or receiver. So that's what Congress put in the statute to ensure that that would be a firearm. If the frame or receiver is not in the box? Oh, then no. If you don't have the frame or receiver, then no. It's not a weapon. So all that matters really is B, the frame or receiver. Well, that is how the statute is structured, and part of that may be due to statutory history. So before this statute, the definition was any weapon that is designed to expel a projectile by the action of an explosive in any part or parts of any such weapon. But what's all that language doing in there if all that matters for the purpose of the definition is that it has a frame or receiver? Well, and so what I was going to say, Your Honor, is that Congress was working from that background, and they said, okay, we're going to alter the definition of A to include readily convertible weapons, and we're going to alter the definition of B instead of including every part to focus on a particular part, the frame or receiver, and it's the frame or receiver of any such weapon, so it really could, so I think that explains, that's why it's structured that way. It's maybe not the most straightforwardly structured statute, but it could be the frame or receiver of, and then insert A instead of any such weapon. That's really how the statute is structured. I'm sorry, could you clarify for me what you mean? Assume that there's all the parts of a gun, a weapons kit with all the parts of the gun, but the receiver or the frame has a hole missing. So that's the weapon parts kit. Is it your position that under A, assuming we were to find that readily convertible does include some drilling, some holes, etc., just like a starter gun to make it a weapon, would that be covered under A? I don't think, I think whether it would be covered would turn on the interpretation of B. If the court accepted our backup argument, Okay, so you're taking out of B readily convertible and also taking it out of A. No, we're not taking it out of A, because of what A was meant to cover, and that is the starter guns that practically were guns. They had handgun frames, but the barrel had to be... You have no quarrel with the proposition that the agency can, within whatever the statute limits it to do, to determine what makes a completed or nearly completed frame a receiver? I'm not sure I understand the question, but we have no quarrel as the alternative we presented with the critical machining test and the hypothetical Your Honor presented with a single hole that likely would meet that task. Anything further? Thank you, counsel. Rebuttal, General? Thank you. Mr. Chief Justice, I want to begin with the question you asked about why manufacturers would leave these holes undrilled. You said, what is the purpose? My friend responded that it's to create a kit that hobbyists can put together. I think that that's a questionable proposition given that if it only takes 20 minutes, the hobbyist is probably not going to get his money's worth and won't actually have the experience of building a gun. But I also think it's contradicted by the facts on the ground because what the evidence shows is that these guns were being purchased and used in crime. They were sold to be crime guns. There was a 1,000% increase between 2017 and 2021 in the number of these guns that were recovered as part of criminal investigations. And it makes perfect sense because the whole reason why you would want to get your hands on one of these un-serialized, untraceable firearms is if you are a prohibited person or you want to use that gun in a crime. And more fundamentally, if there is a market for these kits for hobbyists, they can be sold to hobbyists. You just have to comply with the requirements of the Gun Control Act. Someone who is lawfully allowed to possess the firearm and wants to build it can purchase that kit if they undergo a background check. And so if there is a market for these products, they can operate under the statute. The evidence shows that, actually, the market for ghost guns essentially collapsed after this rule was permitted to go into effect, which I think just underscores what was evident all along. The reason why you want a ghost gun is specifically because it's un-serialized and can't be traced. On the question of a frame or receiver, Justice Sotomayor, you asked questions about exactly what standard governs here, and I think it's helpful to break down the interpretive question into two points. The first one is, this is an undefined term in the statute. Does it require the weapon to be functional? We think the answer to that is no. If you are missing a single hole, then you can clearly recognize that as an unfinished component part of a weapon, and it is readily convertible to function, and that fits within the plain dictionary definition of what a frame or receiver is understood to be, no different than a bicycle missing pedals or a tennis racket that is sold unstrung. We have a picture of this on page 34 of our brief, what these frames and receivers look like, and it's hard to know what else to call them because they look exactly like the principal structural component of a gun. But that just raises the follow-on question, okay, if it doesn't have to be functional, exactly what standard should you use to measure when it is a frame or receiver regulated by the statute? And there are good reasons why ATF focused on whether it can be readily convertible. First, that's most consistent with how Congress has approached this issue when it has defined terms under the federal firearms laws. That's the standard that Congress itself uses to mark the terrain of what products are regulated. Second, there is a consistent agency practice here of applying that readily converted standard. My friend several times tried to suggest that the 50-plus years of agency practice instead focused on whether it has reached a critical stage of manufacture, but that's ignoring the actual elements cited in the classification letters. They looked not just at what had been done to the gun, but what steps remained, how much time it would take to perform those functions, what equipment you would need to make that functional, what kind of skill you would need, and whether there are other parts. None of those elements go to what has already been machined on that particular frame or receiver. Instead, they are centrally relevant to whether it can be readily converted to function just as the agency has said all along. For a third reason, that means that this is a standard that is familiar in the law and familiar to industry. I think it's really notable here that we don't have the major gun manufacturers suing us about this final rule. And the reason for that is because this readily converted standard is the one that has governed their conduct ever since the Gun Control Act was enacted. That also means that there is a stable body of judicial precedent and agency practice to draw on here in further answering concerns about whether particular types of products will be regulated, which I think Justice Kavanaugh also answers some of the concern about how the regulated parties will know whether their conduct falls within the scope of the law. Finally, in thinking about respondents' primary argument here, which is that a single undrilled hole is enough to exempt a product from regulation, I think the court doesn't have to blind itself to the practical ramifications of that rule. The agency's interpretation reflected in this rule is the status quo. It is how the law has been applied over 50 years. And if this court now says that one undrilled hole is enough to exempt these products from regulation, then that is going to be a sea change in how the Gun Control Act is implemented. At that point, it can't serve out its function because all manufacturers everywhere could simply exempt their products from regulation through that simple expedient. And that means that going forward, all guns could become ghost guns. This court said 200 years ago in the MLE that you don't have to interpret a statute to be self-defeating like that if there is a plausible alternative construction. Our construction is not only plausible, it is the best reading of the statute looking at text, context, purpose, and history. So I'd encourage the court to say that and reverse the Fifth Circuit. Thank you, General Counsel. The case is submitted.